UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
                                    :
**LOTTOTRON, INC.,**                :
                                    :
       **Plaintiff,**       :  Civ. No. 10-337 (SRC)
                                    :
    v.                            :  **REPORT AND RECOMMENDATION**
                                    :
**SBG ONLINE CASINO, et al.,**      :
                                    :
       **Defendants.**      :
_____ :

**WALDOR, United States Magistrate Judge**

**I.    INTRODUCTION**

Before the Court is an application by Plaintiff Lottotron, Inc. ("Lottotron" or "Plaintiff") for damages against the six defaulting Defendants in the above-captioned matter. (Docket Entry No. 52, Plaintiff's Certification of Damages Due From Defaulting Defendants ("Pl.'s Br.") at 1). To support its application for damages, Plaintiff has filed a brief, the declaration of Stacy A. Friedman, and the exhibits attached thereto. (See Docket Entry No. 52-3, Declaration of Stacy A. Friedman in Support of Plaintiff's Certification of Damages Due ("Friedman Decl.")). Per Local Civil Rule 72.1, the Honorable Stanley R. Chesler, United States District Judge, referred Plaintiff's application for damages to this Court for a proof hearing and order on the issues of damages. (See Docket Entry No. 48). For the reasons set forth below, the Court orders that judgment be entered against each of the defaulting Defendants for damages in the amounts described herein.

## II. BACKGROUND

### A. Procedural History

On January 21, 2010, Lottotron filed a complaint for patent infringement against various defendants in the United States District Court for the District of New Jersey. (Docket Entry No. 1, Complaint). Specifically, the Complaint alleges that Plaintiff is the owner by assignment of United States Patent No. 5,921,865 ("the '865 patent"), entitled *Computerized Lottery Wage System*. (See id. ¶ 27). The Complaint contends that "[t]he Defendants' operation of their . . . gaming websites directly infringes the claims of the patent in suit in violation of 35 U.S.C. § 271(a)." (Id. ¶ 28). Moreover, the Complaint alleges that Defendants "induced and contributed to the infringement of the claims of the '865 patent by others [,]" which "caused irreparable injury to Lottotron." (Id. ¶¶ 29-30). Consequently, Plaintiff sought, among other relief, money damages in accordance with 35 U.S.C. § 284. (Id. at 6-7).

On June 23, 2010, Plaintiff filed a motion for a default judgment against the following Defendants who failed to answer, or otherwise respond to, Plaintiff's Complaint: Virtual Casino Group ("VCG"), Jeux Virtuels, S.A. ("Jeux Virtuels"), Dulce Vida De Las Americas, S.A. ("Ducle Vida"), Azul Electrico, S.A. ("Azul"), Ala Data Management, S.A. ("Ala"), and Telepublicidad, S.A. ("Telepublicidad"). (Docket Entry No. 21, Plaintiff's Motion for Default Judgment). Plaintiff provided a Certificate of Service declaring that it served copies of its motion for default judgment on the defaulting Defendants. (Docket Entry No. 21-1, Plaintiff's Certificate of Service). Defendants failed to respond. By Order dated August 8, 2011, the Honorable Stanley R. Chesler granted Plaintiff's motion for default judgment solely on liability, but reserved on the issue of damages (Docket Entry. No. 48, Order). The Court ordered that the matter would be referred to the Magistrate Judge for "a proof hearing on the issue of damages."

(Id.). On October 19, 2011, the court ordered Lottotron to submit a certification regarding the amount of damages sought from each defaulting Defendant. (Docket Entry No. 50, Order).

### B. Factual Background in Support of Plaintiff's Application for Damages

Plaintiff notes that it has been forced to "present . . . evidence [of damages] without the benefit of any financial discovery from the defaulting [D]efendants." (Pl's Br. at 4). That is, Plaintiff received no direct evidence of the Defendants' revenues from the infringing conduct or the profits attributable thereto. (Id.). As such, Plaintiff instead draws inferences made from publicly available information about these companies operating offshore in order to calculate revenues and other financial benefits the Defendants derived from their respective infringements of Plaintiff's '865 patent. (Id.).

#### i. VCG

Through the Declaration of its expert, Stacy L. Friedman, accompanied by supporting exhibits, Plaintiff states that Defendant VCG owned, *inter alia*, Wild Vegas Casino. (Friedman Decl. ¶ 3). The website was created in 1999. (Id. ¶ 4 (citing Exhibit ("Ex.") B)). Currently, the games on the Wild Vegas Casino website have been available to wagerers in the United States since 1999 through its website, which advertises a toll-free, 24-hour help line for wagerers in the United States. (Id. ¶ 5 (citing Ex. C)). Plaintiff contends that the progressive jackpot for slot machine games available on the Wild Vegas Casino website collectively approximate $810,000. (Id. ¶ 6 (citing Ex. D)).

#### ii. Jeux Virtuels

Plaintiff asserts that Jeux Virtuels owned the Island Casino website until late 2006. (Friedman Decl. ¶ 7 (citing Ex. E)). Island Casino was established in 1997. (Id. ¶ 8 (citing Ex. F)). The Island Casino website was available to wagerers in the United States, evidenced by the

fact that it provides various U.S. toll-free phone numbers to assist wagerers. (Id. ¶ 9 (citing Ex. G)). The progressive jackpot for Island Casino exceeds $1 million. (Id. ¶10 (citing Ex. H)).

### iii. Ala

Plaintiff submits that Ala was the owner and operator of Sun Palace Casino. (Friedman Decl. ¶ 11 (citing Ex. I); see also Ex. J). Sun Palace Casino accepts wagerers located in the United States. (Id. ¶ 12 (citing Ex. K)). The Sun Palace website was created in 2001. (Id. ¶ 13 (citing Ex. L)). Sun Palace Casino's progressive slot jackpot exceeds $1 million. (Id. 14 (citing Ex. M)).

### iv. Dulce Vida

Plaintiff states that Ducle Vida owned Monte Casino until July 2008. (Friedman Decl. ¶ 15 (citing Ex. N)). The website was founded in 1998. (Id. ¶ 16 (citing Ex. O)). Monte Casino's website allows wagering within the United States. (Id. ¶ 17 (citing Ex. P)). Its progressive slot jackpots exceeds $1 million. (Id. ¶ 18 (citing Ex. Q)).

### v. Azul

Plaintiff asserts that Azul owns World Wide Vegas Casino. (Friedman Decl. ¶ 19 (citing Ex. R)). The website was founded in 1998. (Id. ¶ 20 (citing Ex. S)). The World Wide Vegas Casino website accepts wagering in the United States. (Id. ¶ 21 (citing Ex. T)). Plaintiff submits that the website's progressive jackpots may reach $1 million or more. (Id. ¶ 22 (citing Ex. U)).

### vi. Telepublicidad

Telepublicidad owns the SBG Global casino website. (Friedman Decl. ¶ 23 (citing Ex. V)). The website was created in 1995. (Id. ¶ 24 (citing Ex. W)). The website accepts wagers from individuals within the United States. (Id. ¶ 25 (citing Ex. X)). The website's progressive jackpots reach $1 million. (Id. ¶ 26 (citing Ex. Y)).

4

### III. DISCUSSION

Section 284 of the Patent Act provides: "Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer . . . ." 35 U.S.C. § 284. Damages is the amount of loss sustained by a patentee. Smithkline Diagnostics, Inc. v. Helena Lab. Corp., 926 F.2d 1161, 1164 (Fed. Cir. 1991) (citations omitted). If a patentee is unable to prove actual damages (*i.e.*, the amount of profits actually lost due to the infringing activity), "the patentee is entitled to a reasonable royalty." Id. The period for which a royalty is calculated begins at the later of the commencement of the infringing activity or six years prior to the commencement of the suit. See 35 U.S.C. § 286. A reasonable royalty, in effect, is a "floor below which a damage award may not fall." Fromson v. W. Litho Plate & Supply Co., 853 F.2d 1568, 1574 (Fed. Cir. 1988). Though denoted as a "royalty," it is still a determination of "damages," and the existence of an established royalty helps a court ascertain a "reasonable" royalty. Id.; see also Hanson v. Alpine Valley Ski Area, Inc., 718 F.2d 1075, 1078 (Fed. Cir. 1983) (noting that a "reasonable royalty may be based upon an established royalty, if there is one"). Courts may ascertain a reasonable royalty by determining "the royalty to which a willing licensor and a willing licensee would have agreed at the time the infringement began." Radio Steel & Mfg. Co. v. MTD Prods., Inc., 788 F.2d 1554, 1557 (Fed. Cir. 1986). However, the methodology for determining a reasonable royalty falls ultimately within the court's discretion. See Smithkline, 926 F.2d at 1164; cf. id. at 1164 n.2 (clarifying that a court does not have discretion to choose between basing an award on actual damages or on a reasonable royalty, but that it does have discretion on subsidiary issues such as choosing the methodology for determining a reasonable royalty).

Whether the patentee seeks actual damages or a reasonable royalty, "the amount of a prevailing party's damages is a finding of fact on which the plaintiff bears the burden of proof by a preponderance of the evidence." Smithkline, 926 F.2d at 1164. Further, "when the amount of the damages cannot be ascertained with precision, any doubts regarding the amount must be resolved against the infringer." Lam, Inc. v. Johns-Manville Corp., 718 F.2d 1056, 1065 (Fed. Cir. 1983); see also Trio Process Corp. v. L. Goldstein's Son, Inc., 638 F.2d 661, 663 (3d Cir. 1981) (commenting that "it is often difficult in patent litigation to measure with mathematical precision a patentee's damages"). It follows that while damages "may not be determined by mere speculation or guess, it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." Lam, 718 F.2d at 1065 (quoting Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563 (1931) (internal quotation marks omitted)).

Here, Plaintiff seeks a reasonable royalty from each Defendant, rather than actual damages.[1] (See Pl.'s Br. at 5-7). Therefore, the initial step in the inquiry is to determine an appropriate method by which to calculate a "reasonable" royalty. Plaintiff submits that "[r]oyalty damages are calculated by multiplying the revenue from the infringing activity (royalty base) by the appropriate royalty rate." (Id. at 5). Plaintiff arrives at this methodology by relying substantially on the opinion of its expert witness Stacy L. Friedman. (Id. at 6; see generally 35 U.S.C. § 284 ("The court may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances.")). In this case, Friedman provided an

---

[1] At times in its brief, Plaintiff uses interchangeably "damages" and "royalty" language. (See Pl.'s Br. at 4-7). However, considering the brief in its totality, the Court concludes that Plaintiff seeks a reasonable royalty. (See id. at 4-5) (basing its analysis on the premise that "[a]n established royalty is usually the best measure of a 'reasonable' royalty for a given use of an invention . . . .").

expert opinion on how to calculate a reasonable royalty for Lottotron; specifically, by multiplying the royalty base — the estimated revenue the defaulting Defendants derived from the infringing activity — by the appropriate royalty rate. (Friedman Decl. ¶¶ 5-8). The Court here applies Friedman's methodology because it concludes that it reasonably compensates Plaintiff for Defendants' infringement. See TWM Mfg. Co. v. Dura Corp., 789 F.2d 895, 899 (Fed. Cir. 1986) (noting that Section 284 does not limit a court's discretion "in choosing the analytical approach to determine a reasonable royalty. Section 284 does not mandate how the district court must compute that figure, only that the figure compensate for the infringement."); see also Mahurkar v. C.R. Bard, Inc., 79 F.3d 1572, 1579-80 (Fed. Cir. 1996) (holding that a royalty need only be reasonable and that the "task [of determining a reasonable royalty] is simplified when the record shows an established royalty for the patent in question or for related patents or products"). As Plaintiff argues in its application, Defendants did not provide discovery, thereby preventing Lottotron from obtaining more particularized information regarding Defendants' revenues. (Pl.'s Br. at 1). These Defendants had notice of Lottotron's motion for default judgment and the subsequent hearing before the Court on damages, but they did not respond or participate in the matter. Consequently, in the absence of additional financial discovery or more precise revenue information, Friedman's royalty calculation method provides a sufficient framework for the Court to ascertain a reasonable royalty for Lottotron.

To apply Friedman's royalty calculation method of multiplying the royalty base by a reasonable royalty rate, the Court must first determine the method by which to calculate the royalty base. Plaintiff urges this Court to calculate each Defendant's royalty base by using the method espoused by Friedman in Lottotron, Inc. v. EH New Ventures (See Pl's Br. at 7; Lottotron, Inc. v. EH New Ventures, Inc., et al., Civ. No. 2:09-cv-04942, Docket Entry No. 170,

7

Order (D.N.J. Oct. 6, 2011)). In EH New Ventures, the defaulting defendants — like VCG, Jeux Virtuels, Ala, Dulce Vida, Azul, and Telepublicidad here — failed to provide financial discovery. (See Docket Entry No. 166-1, Declaration of Stacy L. Friedman in Support of Plaintiff's Statement of Damages Due in EH New Ventures ("Friedman Decl. in EH New Ventures") ¶ 2). Because of lack of financial information, Friedman drew inferences about the defaulting defendants' revenues from publicly available information to support Lottotron's application for damages (or, more accurately, its application for reasonable royalties). (Id.).

First, Friedman measured the value of each defaulting defendant's progressive jackpot, finding: (1) Sun Casinos N.V. offered, among other casino-style games, a progressive jackpot slot machine that often reached $1 million (Id. ¶¶ 3-7); (2) Bonne Chance N.V. operated a number of gaming websites and a wagered won a progressive jackpot of more than $2.5 million from one of its sites in September 2009 (Id. ¶¶ 8-13); (3) 3A International N.V. owned Luck3 online casino, which had a minimum of $700,000 in progressive jackpots (Id. ¶¶ 14-18); (4) Pullman Gaming owned the Gold Club Casino wagering website, which featured progressive jackpots of more than $1 million (Id. ¶¶ 19-22); (5) Allgames Casinos Ltd. offered a variety of casino-type online games and wagerers won approximately $157,000 in two months' time (Id. ¶¶ 23-26); (6) CB Corporation offered online casino games and advertised that it awarded approximately $57.5 million annually in prizes (Id. ¶¶ 27-30); (7) i-Services N.V. offered a variety of casino-style online games and advertised that four of its progressive jackpots eclipsed $1 million (Id. ¶¶ 31-35); and (8) Sonsorol, Ltd. offered online games and its progressive jackpot regularly reached $1 million. (Id. ¶¶ 36-39).

Using those publicly available progressive jackpot numbers, Friedman reasoned that:

> Given that the progressive jackpot games offered by the defaulting defendants are only a portion of the games from which such defendants derive revenue, and

given that such jackpots, according to public sources, often reach or exceed $1 million, it is reasonable to conclude that the defaulting defendants' annual revenues reach or exceed $1 million. (Id. ¶ 42).

Friedman explained that progressive jackpots are funded typically as a percentage of total wagering volume, such as 1%. (Id.). For example, a jackpot that is "seeded" with $100,000 and thereafter grows to $1 million in value has gained $900,000 over that time. (Id.).

> If $900,000 represents 1% of total wagering volume, then the total wagering volume was $90,000,000. A typical online casino may offer progressive slot machines at between 95% and 97% RTP (return to player), meaning that the casino keeps between 3% and 5% of the total wagering volume. Five percent of $90,000,000 is $4,500,000 in casino revenue for that particular progressive jackpot game during the particular time period in question. Considering that many casinos offer multiple slot machine games with such jackpots, that jackpots may reach the $1,000,000 mark more than once per year, and that online casinos offer many popular games other than those with progressive jackpots (e.g. roulette and blackjack), it is very likely that the defaulting defendants' annual revenues were in excess of $10,000,000. (Id.).

Assuming $10,000,000 in annual revenues, Friedman projected the estimated total revenue (*i.e.*, the royalty base) that each defaulting defendant accrued during the period of time it infringed Lottotron's '865 patent. (Id. ¶ 43). For example, Friedman posited that Bonne Chance N.V.'s royalty base was $23,000,000, because that particular online casino earned $10,000,000 in annual revenues and infringed Lottotron's '865 patent for twenty-seven months. (Id.). Because Defendants VCG, Jeux Virtuels, Ala, Ducle Vida, Azul, and Telepublicidad have not provided any financial discovery in this case, Plaintiff asserts that the Court should adopt Friedman's method for calculating royalty bases. (See Pl.'s Br. at 1) ("Lottotron obtained no direct evidence of the defaulting [D]efendants' revenues from the infringing acts or the profits attributable to such revenue . . . . Lottotron must, therefore, draw inferences regarding such revenues and profits from publicly [] available information about these companies operating off shore, and the financial benefits they derived from their respective infringements.").

Although Plaintiff urges the Court to determine each Defendant's royalty base by applying Friedman's calculation method, the court in EH New Ventures ascertained the defaulting defendants' royalty bases by using a modified version of Friedman's proposed method (the "Modified Royalty Base Calculation Method"). (See Docket Entry No. 169 Transcript of Damages Hearing in EH New Ventures ("T")). In its October, 4, 2011, hearing on damages, the court in EH New Ventures changed two assumptions that Friedman had made in computing the defaulting defendants' royalty base. (See T38:15-24; T43:12-15). First, the Court directed Friedman to assume that the defaulting defendants' progressive jackpots were funded at 1.5% of total wagering volume, rather than 1%. (T38:4-7). The Court arrived at that 1.5% figure because it was the average between the 1% and 2% funding assumptions that Friedman had posited previously. (See T13:4-25) ("[T]he way a progressive jackpot works, for [] a slot machine game . . . is the jackpot grows, it progresses as a percentage of overall wagering volume . . . . [S]ome percentage of overall wagering, [] goes to the pot . . . . Oftentimes the percentage is around one or maybe two percent of overage wagering volume."). Second, the court instructed Friedman to assume that the defaulting defendants operated their progressive jackpots at 4% RTP, rather than 5% RTP.[2] (T43:12-44:4). The court arrived at 4% RTP because it was the average between the 3% and 5% RTP figures that Friedman had previously posited. (See T16:16-21) ("[M]ost of the

---

[2] The court instructed Friedman to assume 4% RTP, but it actually meant – and the parties understood it to mean – 96% RTP. When a progressive jackpot is operated at 96% RTP, that means 96% of the total wagering volume on the game is "returned to the player." Thus, the online casino keeps 4% of the total wagering volume when a game is operated at 96% RTP. The court called it 4% RTP, rather than its correct designation of 96% RTP, because it was focused on the percentage of total wagering volume that the online casino kept, in order to calculate the defaulting defendant's estimated revenue. For purposes of consistency, and to focus on the amount of total wagering volume kept by the online casino, the remainder of this Order will refer to 95% RTP as 5% RTP; 96% RTP as 4% RTP; and 97% RTP as 3% RTP.

10

time you are having a pay back or what's known as RTP, return to player. And that might be in the three to five percent range.").

Finally, the court adjusted upwards those averages by 10% to account for the other online games offered by the defaulting defendants for which there was no readily ascertainable data on wagering volume or accrued revenue. (T49:12-50:2). Thus, in crafting its Modified Royalty Base Calculation Method, the court instructed Friedman to calculate the royalty bases for the defaulting defendants by (1) assuming their progressive jackpots were funded at 1.5% of total wagering volume, plus an additional 10%, and (2) assuming their progressive jackpots were operated at 4% RTP (that is, with the casino keeping 4% of the total wagering volume on the game), plus the casino keeping an additional 10%. (T50:23-51:4). Friedman applied those metrics, arrived at a 67.2% ratio, and multiplied the original estimated revenues by 67.2%. (T52:3-6). For example, with respect to Bonne Chance N.V., Friedman multiplied the $23,000,000 figure (calculated originally by way of assuming that the online casino earned $10,000,000 in annual revenues and infringed Lottotron's '865 patent for twenty-seven months) by 67.2% to reach a royalty base of $19,488,000. Friedman carried out that formula for each defaulting defendant, and the court in EH New Ventures adopted each final calculation as the applicable royalty base for the corresponding defaulting defendant.

Here, the Court adopts the Modified Royalty Base Calculation Method that the court in EH New Ventures used to determine the royalty bases for each defaulting defendant. This method incorporates the crux of Friedman's expert opinion, while also attempting to strike a measure of balance by settling on the midpoint (1.5%) of the 1-2% progressive jackpot funding range and the midpoint (4% RTP) of the 3-5% RTP range identified by Friedman in both EH New Ventures and in the case at bar. Further, the Modified Royalty Base Calculation Method

11

adjusts those midpoint percentages upward by 10% to account for the various online games upon which revenue data cannot be gleaned with reliable precision. Here, such an upward adjustment by 10% is justified for each Defendant. Each Defendant offers online games beyond their progressive jackpots. (See Pl.'s Br. at 6). Each Defendant also, therefore, earns additional revenues from those online games, but the Court cannot ascertain precisely how much revenue. Therefore, an upward adjustment of 10% of the progressive jackpot funding percentage and the RTP percentage is reasonable. Applying the Modified Royalty Base Calculation Method, the Court finds the following royalty bases:

1. VCG - $40,320,000 ($10,000,000 in annual revenues, multiplied by an infringement period of six years, multiplied by 67.2%);

2. Jeux Virtuels - $18,480,000 ($10,000,000 in annual revenues, multiplied by an infringement period of 2.75 years, multiplied by 67.2%);

3. Ala - $40,320,000 ($10,000,000 in annual revenues, multiplied by an infringement period of six years, multiplied by 67.2%);

4. Dulce Vida - $30,240,000 ($10,000,000 in annual revenues, multiplied by an infringement period of 4.5 years, multiplied by 67.2%);

5. Azul - $40,320,000 ($10,000,000 in annual revenues, multiplied by an infringement period of 6 years, multiplied by 67.2%);

6. Telepublicidad - $40,320,000 ($10,000,000 in annual revenues, multiplied by an infringement period of six years, multiplied by 67.2%).

The next step of the inquiry is to determine an "appropriate" royalty rate to apply to Defendants' royalty bases in order to ascertain a reasonable royalty that each Defendant owes Plaintiff. On this issue, Friedman declared in EH New Ventures that "royalties for intellectual property in the online gaming space shows that such royalties regularly run 10% or more." (Friedman Decl. in EH New Ventures ¶ 40; see also T31:12-25). Friedman based that expert opinion on personal experience in the industry and examination of the Federal Trade

Commission ("FTC") filings by companies that had executed several large-scale licensing agreements, each of which granted the patentee a percentage of revenue that rose from 10% to 35% or more over the span of the agreement. (T31:21-32:21). Consequently, Friedman picked 10% as a conservative estimate of a reasonable royalty. (T32:21-22). Given the low overhead attendant to online casino games, Friedman stated that a royalty rate of 10% was eminently reasonable. (Friedman Decl. in EH New Ventures ¶ 41; see also T3636:3-18). The Court in EH New Ventures accepted Friedman's rationale and determined that the 10% royalty rate was reasonable. (T44:5-8) ("[The Court is] accepting your 10% royalty estimation as grounded in sufficient basis in fact to be a - - a reasonable estimate as distinguished from speculation.").

Here, Plaintiff relies on Friedman's analysis and applies a "conservative" royalty rate of 10% to the royalty base of each Defendant. (Pl.'s Br. at 7; Friedman Decl. ¶ 30). For the reasons articulated by Friedman in EH New Ventures, the Court here finds that a 10% royalty rate is indeed reasonable. The Court applies that 10% rate to the royalty bases for the defaulting Defendants in this case, and as such, finds that each Defendant owes Plaintiff the following royalties:

1. VCG - $4,032,000 ($40,320,000 royalty base, multiplied by the reasonable royalty rate of 10%);

2. Jeux Virtuels - $1,848,000 ($18,480,000 royalty base, multiplied by the reasonable royalty rate of 10%);

3. Ala - $4,032,000 ($40,320,000 royalty base, multiplied by the reasonable royalty rate of 10%);

4. Dulce Vida - $3,024,000 ($30,240,000 royalty base, multiplied by the reasonable royalty rate of 10%);

5. Azul - $4,032,000 ($40,320,000 royalty base, multiplied by the reasonable royalty rate of 10%);

6. Telepublicidad - $4,032,000 ($40,320,000 royalty base, multiplied by the reasonable royalty rate of 10%).

## IV. CONCLUSION

For the reasons stated above, it is hereby ordered that a judgment be entered against each of the defaulting Defendants for damages in the following amounts:

1. VCG - $4,032,000;
2. Jeux Virtuels - $1,848,000;
3. Ala - $4,032,000;
4. Dulce Vida - $3,024,000;
5. Azul - $4,032,000; and
6. Telepublicidad - $4,032,000

It is furthered Ordered that counsel for Plaintiffs serve a copy of this Opinion and Order on all defendants within (7) days of the date below.

**SO ORDERED**

s/ Cathy L. Waldor
CATHY L. WALDOR
UNITED STATES MAGISTRATE JUDGE

DATED: September 16, 2013